IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-1565 |
| v. | ) | |
| | ) | |
| UPMC HEALTH SYSTEM | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CONTI, District Judge**

### I.      Introduction

Susan Paul ("plaintiff"), initiated this action against her former employer, UPMC Health

System ("defendant"), alleging violations of the Fair Labor Standards Act of 1938, as amended

("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Pennsylvania Minimum Wage Act, as amended

("PMWA"), 43 PA. CONS. STAT. §§ 333.101 *et seq.*, the Family and Medical Leave Act of 1993,

as amended ("FMLA"), 29 U.S.C. §§ 2601-54, and the Pennsylvania Whistleblower Protection

Act, as amended ("WPA"), 43 PA. CONS. STAT. §§ 1421 *et seq.*  The alleged violations of these

statutes are set forth in three counts: count I alleges violations of the FLSA and PMWA, count II

alleges a violation of the FMLA, and count III alleges a violation of the WPA.  Pending before

the court is defendant's motion for summary judgment on all three counts (Doc. No. 15).

After considering defendant's motion for summary judgment, plaintiff's response (Doc.

No. 21), the joint statement of material facts (Doc. No. 28), and the parties' other submissions,

the court will grant defendant's motion for summary judgment with respect to all of plaintiff's

claims because plaintiff withdrew her claim under the WPA and no reasonable trier of fact could render a verdict in favor of plaintiff on any of the other claims.

## II.    Factual Background

In 1996, plaintiff accepted employment with defendant as manager of grants, funding and budgets at Beaver Valley Mental Health Services ("Beaver Valley H. Serv."). (Joint Statement of Material Facts (Doc. No. 28), Def.'s Stat. Facts ("Def.'s S.F.") ¶ 1.) Beaver Valley H. Serv. was a satellite office of Western Psychiatric Institute & Clinic ("WPIC"), providing mental health services on an outpatient basis. (Id.; Deposition of Plaintiff ("Pl.'s Dep.") at 17.) Plaintiff described her job responsibilities as "putting together numbers and gathering information"; plaintiff testified she was involved largely in clerical and data input functions. (Joint Statement of Material Facts (Doc. No. 28), Pl.'s Stat. Facts ("Pl.'s S.F.") ¶ 1; Pl.'s Dep. at 17-28.) The primary duties of plaintiff's position concerned Beaver Valley H. Serv.'s fiscal operations, including preparation of budgets and financial reports, and preparing, auditing, and insuring compliance with contracts entered into by WPIC with various local entities for the provision of mental health services. (Def.'s S.F. ¶ 6.) The "job purpose" was set forth in the job description for plaintiff's position as follows:

> Prepares or supervises the preparation of MH/MR, Children &
> Youth, United Way and BCTA contracts and budgets. Works
> closely with the Controller of Finance, Director of Mental Health
> Services and Department Managers relating to the hospital, ie.
> preparing budgets, studies and financial reports. Supervises
> Contract Billing Clerk.

(Def.'s S.F. ¶ 7; Pl.'s Dep. Ex. F.)

Plaintiff stated that she performed, inter alia, the following duties:

> I did budgets, and I also worked on county contracts where I pulled together the budget and all of the information from the county, like Children & Youth, I did contracts. They would send it to my office, I would put together the information. And then this would all have to go up to Oakland. They would review everything and they would make changes, if necessary. And then they would send it back to me and tell me it was – they would sign it. I had to have the vice president of finance sign all my contracts.
>
> So, after they approved it, made any changes, they would sign the contracts, send them back to me. I would do things like make the copies and send them to the appropriate offices and then send the originals back to the county's agency I was working with. So I did this with CYS, I also did it with Mental Health/Mental Retardation, that's MH/MR in our county. I also did it with the Beaver County Transit Authority. So, kind of all that funneled into my office, I did all of the kind of data entry work and put in the appropriate sheets of paper than needed to be done, whether it be if they need a certificate, then I would write an E-mail and get a certificate. And I kind of packaged it together and then sent it up to accounting for their review and change.

(Pl.'s Dep. at 19-20.) A person who worked under plaintiff's supervision handled billing. (Pl.'s Dep. at 89-90.)

As part of plaintiff's responsibility to oversee the billing of contracts, plaintiff prepared budgets under those contracts. WPIC would at times propose various "cuts" in the budgets to save defendant money. Plaintiff had the authority to decide whether to include the cuts in the budgets that were submitted to the Oakland financial office. (Pl.'s Dep. at 83-86.)

Despite working on contracts, plaintiff had no authority to negotiate contracts. (Pl.'s S.F. ¶ 7) Much of plaintiff's work was sent to superiors in defendant's Oakland financial office for review. (Pl.'s S.F. ¶ 4.) Those superiors would make necessary corrections. (Id.) Plaintiff reported directly to Diane Ludewig ("Ludewig"), the director of Beaver Valley H. Serv. (Def.'s S.F. ¶ 2.)

In January 2006, the title of plaintiff's position was changed to financial analyst II. (Def.'s S.F. ¶ 4.) This change was implemented because plaintiff's salary exceeded the maximum salary allowed under the former position. (Id.) The financial analyst II position had a higher maximum salary, and the switch allowed defendant to continue to award plaintiff annual salary increases contemplated by defendant's compensation system. (Id.) The change did not, however, alter plaintiff's duties and responsibilities with respect to fiscal and budgetary matters. (Def.'s S.F. ¶ 5.)

In 2002, plaintiff alleges Ludewig attempted to misrepresent financial information. At the time, defendant had a contract with Children and Youth Services under which that agency reimbursed defendant for one half of the salary of an employee of defendant. Ludewig suggested the submission of a proposed budget to the WPIC financial office that shifted the employee's entire salary to Children and Youth Services. Such a shift would have saved defendant approximately $25,000. Plaintiff, however, objected to Ludewig's suggestion, arguing that the contract did not permit that cost shifting. Ludewig argued that a head of the agency agreed to that cost shifting, but plaintiff insisted that the shift was not permitted without written verification from Children and Youth Services. Plaintiff refused to communicate Ludewig's proposal to WPIC, and Children and Youth Services was never billed for the full salary. (Def.'s S.F. ¶ 45; Pl.'s Dep. at 84-91, 100-01.)

Also in 2002, plaintiff alleges that Ludewig instructed her to not provide information "to Oakland" unless "they asked." (Def.'s S.F. ¶ 46; Pl.'s Dep. at 92-93.) Plaintiff told Ludewig that a significant amount of overtime compensation was paid to employees on a certain project. Plaintiff testified that she told Ludewig "we're supposed to cut it." (Def.'s S.F. ¶ 46; Pl.'s Dep.

at 92-93.)  Ludewig allegedly responded to plaintiff that she was not to "report that to Oakland," because the "the people [Ludewig] work with in Oakland, they've okayed anything I do."  (Def.'s S.F. ¶ 46; Pl.'s Dep. at 92-93.)  In addition, Ludewig restricted plaintiff for a time period from asking questions by email to certain people in defendant's organization.  (Pl.'s S.F. ¶ 16; Pl.'s Dep. at 33-35.)

On another occasion, Ludewig desired to purchase equipment with approximately $10,000 in excess funds not spent under a contract.  Plaintiff contended that the contract did not permit the funds to be spent on the items Ludewig wished to purchase.  Plaintiff contacted the other party to the contract, and determined that defendant could not spend the money on equipment.  (Def.'s S.F. ¶ 47; Pl.'s Dep. at 96-100.)

At certain times of the year, plaintiff had more work to do than at other times of the year. (Pl.'s Dep. at 23-25.)  During the peak times, plaintiff worked an average of forty-five to fifty hours per week.  (Def.'s S.F. ¶ 13; Pl.'s Dep. at 73-74.)  From 1996 until August 2002, plaintiff worked a full-time schedule, was paid an annual salary, and was paid the same amount each week regardless of the number of hours she worked.  (Def.'s S.F. ¶ 14.)

In 2001, Ludewig expanded plaintiff's responsibilities to include the oversight of finances for a private physicians' office located at Beaver Valley H. Serv.  (Def.'s S.F. ¶ 10.)  Ludewig reorganized office functions in 2002, and decided that plaintiff would no longer oversee this physicians' office.  (Def.'s S.F. ¶ 21.)  Ludewig advised plaintiff of this change on June 5, 2002. (Id.)  Plaintiff wrote an email message to Ludewig on June 6, 2002, requesting that Ludewig "please let me know when your new plan goes into effect and when I will no longer be in charge of the physicians' office."  (Def.'s S.F. ¶ 22.)  On July 11, 2002, physicians, managers, and staff

were informed that a new department had been created and that plaintiff no longer had responsibility for the physicians' office. (Def.'s S.F. ¶ 23.)

On July 2, 2002, plaintiff went on leave under the FMLA due to stress. (Def.'s S.F. ¶ 24; Pl.'s Dep. at 11-15.) Plaintiff returned on August 13, 2002. (Def.'s S.F. ¶ 24.) Although plaintiff was never criticized or reprimanded for taking medical leave, Ludewig informed her upon her return that she would no longer manage the physicians' office. (Def.'s S.F. ¶¶ 25, 26.) At that time of plaintiff's return, Ludewig also told plaintiff that because of the reorganization and the nature of her position, she would be reclassified from a full-time employee to a "Flexible, Full-Time Employee." (Def.'s S.F. ¶¶ 15, 26.) As a Flexible, Full-Time Employee, plaintiff was scheduled to work full time during the budget period time of year, and part time during the non-budget period time of year, depending upon Beaver Valley H. Serv.'s budget schedule. (Def.'s S.F. ¶ 16.) When working part time, plaintiff was ordinarily scheduled to only work twenty hours per week, but plaintiff continued to perform the same duties as she did when working full time. (Def.'s S.F. ¶¶ 16, 17.) During the non-budget period, plaintiff was paid on an hourly basis. (Def.'s S.F. ¶ 19.) While employed part time, plaintiff never worked in excess of forty hours during any work week. (Def.'s S.F. ¶ 20; Pl.'s Dep. Ex. I.)

Plaintiff contested the reclassification, believing her position had always been full time prior to June 2002, and, even though she had been relieved of the duties with respect to the physicians' office, she claimed she had been given additional work to compensate for the loss. (Def.'s S.F. ¶ 27.)

During the budget period, plaintiff was paid a salary. (Def.'s S.F. ¶ 18.) When plaintiff was classified as a full-time employee, she recorded on her time sheets that she worked forty

hours per week; she was instructed to do so. (Pl.'s S.F. ¶ 13; Pl.'s Dep. at 30-31, 56-57.)

Ludewig did not expect plaintiff's time sheets to reflect the actual hours plaintiff worked during

the budget period. (Pl.'s S.F. ¶ 35.) Plaintiff was paid for forty hours per week, even if she

worked more, at a rate of over $22.00 per hour. (Pl.'s Dep. at 30.) Plaintiff was paid, on a

consistent basis when working full time, a fixed amount of more than $880 per week. When

plaintiff was working full time, she was required to use paid sick time or vacation time to take

time off due to personal or medical reasons. (Pl.'s S.F. ¶ 14; Pl.'s Dep. at 56-59.)

Plaintiff communicated her belief about the reclassification to defendant on a number of

occasions. (Def.'s S.F. ¶ 27.) On October 13, 2003, plaintiff drafted a memorandum to Ludewig

in support of her contention that her job required a forty-hour work week. (Def.'s S.F. ¶ 27; Pl.'s

Dep. Ex. R.) On November 24, 2004, plaintiff drafted a memorandum to Ludewig and David

Bobrzynski ("Bobrzynski"), vice president of WPIC's finances, listing plaintiff's job duties to

support her claim for the "need for staying on a full-time basis." (Def.'s S.F. ¶ 27; Pl.'s Dep. At

117-18; Pl.'s Dep. Ex. T.) On July 7, 2005 plaintiff sent a letter to Ludewig, objecting to her

upcoming change to a part-time schedule, expressing her belief that the reduction in hours was

"personal" as opposed to operational, and requesting a written justification for the reduced

schedule. (Def.'s S.F. ¶ 27; Pl.'s Dep. Ex. V.) On August 17, 2005, plaintiff sent an email

message to Ludewig concerning plaintiff's August 3, 2005 request to be scheduled for additional

hours. (Def.'s S.F. ¶ 27; Pl.'s Dep. Ex. W.) On November 15 and 16, 2005, plaintiff sent email

messages to Ludewig concerning her request to be scheduled full time due to her work load.

(Def.'s S.F. ¶ 27; Pl.'s Dep. Ex. Y.) On December 1, 2005, plaintiff sent an email message to

David Sveizkas ("Sveizkas"), who was in defendant's finance department, containing a matrix of

her work load in support of her request to be scheduled full time commencing January 1, 2006, and referencing the denial of her request to be so scheduled for December 2005. (Def.'s S.F. ¶ 27; Pl.'s Dep. Ex. Z.) On June 23 and 26, 2006, plaintiff sent email messages to Ludewig in which plaintiff again challenged her upcoming change to a part-time schedule. (Def.'s S.F. ¶ 27; Pl.'s Dep. Ex. EE.) On September 25, 2006, plaintiff sent an email message to Ludewig in which plaintiff wrote, "I don't believe that I will be able to complete all this only working 28 hrs [sic] per week." (Def.'s S.F. ¶ 27; Pl.'s Dep. Ex. GG.)

After plaintiff's June 2006 request, Ludewig warned plaintiff that "she would write [plaintiff] up as being insubordinate if [plaintiff] ever bring [sic] up needing more hours to work." (Pl.'s Dep. Ex. NN.) On October 4, 2006, Ludewig met with plaintiff and told plaintiff that if she cannot do her job within the time allotted, then she should consider resigning. (Def.'s S.F. ¶ 34; Pl.'s Dep. Ex. KK.)

When advised of plaintiff's resistance to her summer 2006 schedule, Eleanor Medved ("Medved"), who was vice president of ambulatory services for WPIC, initiated a review by the WPIC fiscal department of the time needed to perform plaintiff's job. (Def.'s S.F. ¶ 37.) Medved in fact had been involved in determining and evaluating the number of hours plaintiff needed to fulfill her job duties since 2004. (Def.'s S.F. ¶ 38; Medved Dep. at 18.) The "discussion of termination" of plaintiff's employment was initiated shortly after plaintiff resisted her part-time schedule in 2006, but Medved cannot recall the exact date those discussions began. (Medved Dep. at 37-38, 44-45.) Upon completion of the review, WPIC decided that the fiscal responsibilities of plaintiff's position could be absorbed by WPIC's fiscal department and other employees at Beaver Valley H. Serv. (Def.'s S.F. ¶ 39; Medved Dep. at 40-46.) WPIC handled

fiscal responsibilities in this manner with respect to its other satellite offices. (Def.'s S.F. ¶ 39.) Beaver Valley H. Serv. was at the time operating at an annual loss of between $600,000 and $800,000 over the course of several years, and WPIC's fiscal department was searching for ways to cut expenses. (Id.)

On October 9, 2006, plaintiff filed an internal grievance letter against Ludewig. (J.S. ¶ 43.) The grievance letter stated:

> My problems with Diane Ludwig started in 2002. Diane Ludwig has asked me to misrepresent financial information to Oakland and also I was told to not give Oakland any information unless they asked. There was another Manager present when Diane Ludwig [sic] wanted me to report that CYS was going to give us additional money and it was not approved by CYS. Diane Ludwig was told to cut the budget or find a way to meet the budget numbers requested by Oakland. I have documentation and details if needed. I have had to endure an extremely unhealthy work environment for several years. This includes intimidation; being yelled at, bullied, threaten [sic] with losing my job and shunning from Diane Ludwig. . . . I know UPMC does not promote this type of behavior. According to the Standards of Conduct UPMC is committed to honesty, just management, and fairness, providing for a safe and healthy environment, and respecting the dignity due everyone.

(Def.'s S.F. ¶¶ 44, 48; Pl.'s Dep. Ex. NN.) The grievance letter included a recitation of the history underlying plaintiff's claims against Ludewig. (Def.'s S.F. ¶ 49.) Plaintiff specifically referred to Ludewig's 2002 decisions to remove her from management of the physicians' office and to reclassify her position as a Flexible, Full-Time Employee. (Id.) Plaintiff noted that Ludewig communicated those decisions to her immediately upon her return from medical leave. (Id.)

Plaintiff asserted that the FMLA requires an employer to restore an employee to his or her original job upon return from leave with equivalent pay, benefits, and other terms and conditions

9

of employment.  (Id.)  Plaintiff argued that this was not done, and even if defendant wanted to

reorganize job responsibilities, her position upon return from leave had to be full time as required

by law.  (Id.)  In relevant part, the grievance letter stated:

> I was given Medical Leave by UPMC-WPIC from 7-2-02 to 8-13-02.  (This was because of health issues that developed from work.)  I returned to work on 8-13-02 with a doctor's excuse to work the first two weeks after my return at 4-6 hrs per day and then go back to full-time.  On 8-14-02 Diane Ludewig met with me at 10:30 AM and informed me that I would be a flexible full-time employee.  I received a memo from her stating this also.  At the meeting on 8-14-02- I had the following questions: Why was this done?  Diane Ludewig stated a business decision.  Also in a memo (7/11/02) Diane Ludewig stated, "We also want to extend our thanks to [plaintiff] for her management of the physicians' offices.  As the number of grants we receive has increased, we need her expertise full time in the fiscal arena."  She also states the same thing in Management Meeting minutes on July 18, 2002.  All documents on my Medical Leave should be in my HR file.
>
> . . .
>
> I returned to work on August 13th, and on August 14th, Diane Ludewig met with me to inform me that she would no longer need me to work full-time.  Per memo, I am to work 6 months at 20 hrs. per week and 6 months at 40 hrs. per week.  While I was off the Physicians Office was put under another manager.  Prior to me overseeing the Physicians Office, I was a full-time employee at the WPIC, Rochester site.  On May 31, 2002, I wrote Diane Ludewig suggestions to change the physicians' office.  If this is an honest system change than my job should not have been affected.  They had to promote a line staff to a manager and have another manager oversee the work that I was expected to do plus my full-time financial role.  As I stated I had a full-time position at the Rochester site prior to the physician's office responsibilities were given to me.  I have been requesting from Diane Ludewig to give me a office manager for over a year to assist me because of my heavy workload I was told that she is aware of my needs but could not do this because of a law suite [sic] pending with Beverly Davis (who was the office manager) regarding age discrimination.  Diane Ludewig knew from the beginning that I would need to have an office manager to properly run the Physicians Office because of my

workload. There are months that I don't leave my office when I
am working on Budgets and Contracts.

Also, according to the Family and Medical Leave Act of 1993;
Upon return from FMLA leave, an employee must be restored to
the employee's original job, or to an equivalent job with equivalent
pay, benefits, and other terms and conditions of employment. This
was not done and even if Diane Ludewig wanted to restructure the
Physicians' Office and other services my job was full-time at
Rochester prior to her giving me the Physicians' Office duties.
Diane Ludewig has the right as Director to change operations but
not to use this change to penalize me.

(Pl.'s Dep. Ex. NN.)

On October 10, 2006, plaintiff sent the grievance letter to Kelli-Ann Reale ("Reale"),

Maureen Szewczyk ("Szewczyk"), and Kathryn Devine ("Devine"), who are members of

defendant's human resources department. (Def.'s S.F. ¶ 50; Pl.'s S.F. ¶ 17; Pl.'s Dep. at 104-05.)

After Reale received the grievance, she forwarded it to Edward McGinley ("McGinley"), an

attorney in UPMC's legal department. In an email message Reale stated that there were ongoing

discussions about a possible termination of plaintiff's employment at the time. (Def.'s S.F. ¶ 50;

Medved Dep. Ex. 1.) Reale did not show the grievance to either Medved or Ludewig, because

Reale had already been discussing the elimination of plaintiff's job with those two individuals.

(Id.) Although it was customary for Reale to perform an investigation after receiving a grievance

request, Reale did not perform an investigation in this situation. (Reale Dep. at 54-55.)

Ludewig, Reale, Bobrzynski, Sveizkas, and McGinley were all involved in the decision to

terminate plaintiff. (Medved Dep. at 26-27.) Medved testified that she did not recall the date of

the decision to terminate plaintiff's employment. (Medved Dep. at 36-38.) On October 19,

2006, plaintiff was informed that her position had been eliminated for business reasons. (Def.'s

S.F. ¶ 40.) Specifically, plaintiff was informed that the duties of her position could be assumed

by other employees, and that defendant was experiencing financial difficulties. (Id.)

After plaintiff was terminated, many of her job duties were assumed by Ludewig and Andre West ("West"), a crisis manager at Beaver Valley H. Serv. and one of plaintiff's former co-workers. (Pl.'s S.F. ¶ 29.) Neither West nor Ludewig were accountants. (Pl.'s S.F. ¶ 30.)

## IV.     Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party"). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept
> a moving party's necessary propositions of fact, pre-trial judgment
> cannot be granted. Specious objections will not, of course, defeat a
> motion for summary judgment, but real questions about credibility,
> gaps in the evidence, and doubts as to the sufficiency of the
> movant's proof, will.

Id.  The court may consider any material or evidence that would be admissible or usable at trial in

deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.

1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL

PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp.

35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary

judgment, the court is entitled to consider exhibits and other papers that have been identified by

affidavit or otherwise made admissible in evidence").


## V.    Discussion

### A.    Count I – FLSA and PMWA Claims

In her complaint, plaintiff asserts that defendant failed to pay overtime to plaintiff for

hours worked in excess of forty hours in many work weeks, in violation of the FLSA and the

PMWA.  Plaintiff also asserts defendant failed to maintain accurate time records in accordance

with the FLSA.  Defendant argues in response that plaintiff was properly classified as an exempt

employee, and therefore was not entitled to overtime pay under either statute.[2]  Defendant also

argues that plaintiff failed to raise an issue of material fact concerning whether defendant

violated the record keeping obligations of the FLSA.

---

2 The exemptions under both the FLSA and PMWA are identical.  See 29 U.S.C. § 213(a)(1); 43 PA. CONS. STAT. §
333.105(a)(5).  The court will only analyze the applicability of the administrative exemption to plaintiff's FLSA
claim; the same analysis, however, also applies to plaintiff's PMWA claim.  The decision with respect to plaintiff's
FLSA claim is therefore dispositive of plaintiff's PMWA claim.

1.      **Overtime Pay**

The FLSA provides as a general rule that an employer shall not subject its employees to a work week of more than forty hours, without compensating the employees at a special overtime rate:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  The FLSA provides exceptions to this rule, however, for employees who classify under one of the several exemptions set forth in the FLSA.  One such exemption is the "administrative exemption, which applies to "any employee employed in a bona fide . . . administrative . . . capacity."  29 U.S.C. § 213(a)(1).  Defendant argues plaintiff's position qualified under the administrative exemption and for that reason it was not required to pay plaintiff the overtime rate; defendant has the burden of establishing any exemption from the FLSA's general overtime provisions.  Martin v. Cooper Electric Supply Co., 940 F.2d 896, 900 (3d Cir. 1991).  "[I]f the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden."  Id. (citing Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 206 (1966)).  The FLSA exemptions are to be narrowly construed.  Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960).

Whether an exemption applies is a mixed question of law and fact.  Martin, 940 F.2d at 900.  The court must construe the facts of the record in light most favorable to plaintiff and draw factual inferences in favor of plaintiff from the record.  Id.  The court must determine whether,

given the facts and inferences, plaintiff is exempt as a matter of law. <u>Hein v. PNC Fin. Servs.</u> <u>Group, Inc.</u>, 511 F. Supp. 2d 563, 570 (E.D. Pa. 2007).

The administrative exemption applies if the employee (1) is compensated on a salary basis of not less than $455 per week, (2) primarily performs office or non-manual work directly related to management or general business operations of the employer, and (3) exercises discretion or independent judgment. 29 C.F.R. § 541.200(a); <u>see</u> <u>Zalewski v. PNC Fin. Servs.</u> <u>Group, Inc.</u>, 555 F. Supp. 2d 555, 564 (W.D. Pa. 2008). "A job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2. Instead, the application of the exemption depends upon whether the employee's salary and duties meet the requirements of the three-part test. <u>Id.</u>

### a. Salary Basis Test

The first part of the three-part test for the administrative exemption is known as the salary basis test. To satisfy the salary basis test, plaintiff must be paid on a "salary basis" as defined in 29 C.F.R. § 541.602 and be compensated at a rate of at least $455 per week. 29 C.F.R. § 541.200.

29 C.F.R. § 541.602 defines "salary basis" generally as follows:

> [T]he employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. . . . [A]n exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work. An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and

able to work, deductions may not be made for time when work is
not available.

29 C.F.R. § 541.602(a).

Defendant argues the salary basis test is met, because, during weeks in which plaintiff

worked full time, she was paid for forty hours at a rate of slightly over $22.00 per hour. Plaintiff

was therefore paid a fixed amount of approximately $880.00 per week. Defendant argues that

this clearly meets the requirement of the salary basis test of at least $455.00 per week.

Plaintiff argues that there is a genuine issue of material fact about whether the salary basis

test is met. Specifically, plaintiff argues that she was explicitly told that, during the period in

which she was employed full time, she had to work a full eight hours per day or use sick time.

Plaintiff asserts that because defendant engaged in this practice, she was not paid on a salary

basis as defined in the regulations.

Despite plaintiff's arguments, requiring plaintiff to use paid time off to cover full or

partial day absences does not negate that plaintiff was paid on a salaried basis. Webster v. Pub.

Sch. Employees of Washington, 247 F.3d 910, 917 (9th Cir. 2001); Wage & Hour Op. Ltr., 1994

WL 1004772, at *2 (Apr. 13, 1994) ("[I]t is permissible to substitute or reduce the accrued leave

in [an employer's bona fide benefit plan] for the time an employee is absent from work even if it

is less than a full day without affecting the salary basis of payment."). Under section 541.602 of

the regulations, the key inquiry is whether plaintiff's salary has been reduced, and not whether

sick time or vacation or other benefits are reduced; there is "a distinction between deductions

from base-pay salary and deductions from fringe benefits." 29 C.F.R. § 541.602; Webster, 247

F.3d at 917 (citing Barner v. City of Novato, 17 F.3d 1256, 1261-62 (9th Cir. 1994)). Because

the amount plaintiff was paid per week while working full time was not changed as result of her

16

absences and her salary was not reduced, no reasonable finder of fact could conclude that plaintiff was not paid on a salary basis.

### b.    Primary Duty Test

The second part of the three-part test for the administrative exemption is referred to as the primary duty test, which requires the employee's primary duty be to perform office or non-manual work directly related to management or general business operations of the employer. "Primary duty" is defined as the "principal, main, major or most important duty that employee performs." 29 C.F.R. § 541.700. Additionally, "determination of the primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id. The focus is on the evidence of the plaintiff's day-to-day duties, and not on job descriptions, resumes, or performance evaluations. See Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400 (6th Cir. 2004).

In its summary judgment motion, defendant argues that plaintiff had a number of regular duties, and that these duties involved auditing, budgeting, or legal and regulatory compliance. Defendant argues that each of these duties are the kind of duties that the FLSA regulations specifically identify as relating to management or general business operations.

Plaintiff did not respond to defendant's argument with respect to the second part of the test for the exemption, despite plaintiff's own deposition testimony that many of the tasks she performed were clerical and involved the collection and entry of data. Since defendant's arguments about the primary duty of plaintiff's position are not contested, the court will deem this part of the test met. Furthermore, the evidence of record, even if construed most favorably for plaintiff, establishes that the primary duty of her position was directly related to defendant's

general business operations.  Plaintiff did not offer evidence of the percentage of time she spent doing various tasks.  See 29 C.F.R. § 541.700(b) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.").  Even assuming she spent a large percentage of her time performing data entry or other menial tasks, plaintiff does not dispute that she had primary responsibility to make key decisions with respect to certain contracts.  Such responsibility falls within the functional areas of finance and budgeting, which the regulations specifically deem as having a direct relation to business operations.  See 29 C.F.R. § 541.201(b); Hills v. Western Paper Co., 825 F. Supp. 936, 938-39 (D. Kan. 1993) (employee qualified for administrative exemption even if she spent more than one half of her time doing bookkeeping and clerical work, because her primary duties directly related to employer's management policies and general business operations, and she exercised discretion and independent judgment).

<h3 align="center">c.  Discretion and Independent Judgment Test</h3>

The third part of the three-part test for the administrative exemption is known as the discretion or independent judgment test.  Discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate direction or supervision."  29 C.F.R. § 541.202(c).  The determination whether the employee exercises discretion or independent judgment must take into account "all the facts involved in the particular employment situation in which the question arises."  29 C.F.R. § 541.202(b).

An employee can exercise discretion and independent judgment even if his or her decisions or recommendations are not final, but rather are reviewed by others in the organization. 29 C.F.R. § 541.202(c).  The exercise of discretion and independent judgment must be "more

than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). The exercise of discretion and independent judgment does not include "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a 'statistician.'" Id. An employee does not exercise discretion and independent judgment merely because the employer will experience financial losses if the employee fails to perform properly the job. 29 C.F.R. § 541.202(f).

Defendant argues that plaintiff exercised discretion and independent judgment in performing the responsibilities associated with her position, by pointing to several of the factors listed in section 541.202(b) of the regulations:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; . . . whether the employee investigates and resolves matters of significance on behalf of management . . . .

29 C.F.R. § 541.202(b). Defendant explains that plaintiff's duties, which included preparing budgets and other fiscal information, working with department managers, interacting with county agencies, and overseeing the billing and auditing of Beaver Valley H. Serv.'s contracts, all were performed without any lateral oversight and minimal involvement of superiors. Defendant points to specific incidents as examples of the exercise of discretion and independent authority. Ludewig attempted to shift the portion of a salary of a WPIC employee to a county agency, pursuant to one of the contracts with that agency. Plaintiff insisted that such a shift was not

permitted under the contract and instructed the billing clerk to not include the suggested "cut" in the proposed budget. Ludewig attempted to use funds that had not been spent on a particular contract in order to purchase equipment. Plaintiff refused to allow the expenditure, since the contract did not permit the use of the funds for that purpose.

In plaintiff's brief in response, she argues that Ludewig specifically prohibited her from contacting certain individuals, and also for a certain time period prohibited her from asking questions via email to other people within defendant's organization. Plaintiff argues that this removal of authority proves she was dependent upon her supervisors in conducting her duties. Plaintiff asserts that, after she was terminated, the duties associated with her job were handled by employees with no accounting skills or experience. Plaintiff argues that this is evidence that her position involved the mere entry of data into a standard computer program.

The totality of the evidence in this case, even when viewed in plaintiff's favor, demonstrates that plaintiff exercised independent discretion. Although plaintiff attempts to portray herself as a clerical employee, the undisputed evidence of record establishes that her position's duties required analysis and decision making. The fact that other employees without specialized skill assumed the duties of plaintiff's job is not a factor in the determination whether her position required the exercise of discretion or independent judgment. Plaintiff's position may have largely involved the entry of data, but she nevertheless had to exercise her own judgment in accomplishing that task. In overseeing the billing of contracts, plaintiff had to prepare budgets. WPIC would ask plaintiff to propose "cuts" in the budgets to save money; plaintiff had the discretion to determine which cuts to propose, and plaintiff sent those budgets to the Oakland office for review. Plaintiff does not dispute that she had the discretion to approve or disapprove

purchases and expenditures within contractual and budgetary guidelines, even when WPIC and

her direct supervisor suggested otherwise.  Such responsibility demonstrates that the duties of

plaintiff's position affected a segment of defendant's business operations to a substantial degree,

and that she investigated and resolved matters of significance on behalf of her manager,

Ludewig.  Such responsibility also demonstrates that plaintiff's position exercised authority to

commit the employer in matters that have significant financial impact.  Her decisions not being

final and having to be reviewed by superiors or others in the Oakland office do not render her

without discretion or independent judgment.

> The decisions made as a result of the exercise of discretion and
> independent judgment may consist of recommendations for action
> rather than the actual taking of action. The fact that an employee's
> decision may be subject to review and that upon occasion the
> decisions are revised or reversed after review does not mean that
> the employee is not exercising discretion and independent
> judgment.

29 C.F.R. § 541.202(c); see Levie v. AT&T Communications, Inc., No. 1:88-CV-2132, 1990 WL

61174, at *6 (N.D. Ga. Mar. 15, 1990) (among other duties, the employee approved equipment

purchases, although the employee's decisions were subject to review; the district court held that

plaintiff exercised discretion and independent judgment, and granted summary judgment in

employer's favor).  Under the circumstances presented in the record, the court concludes that a

reasonable finder of fact could only conclude that plaintiff exercised discretion or independent

judgment.  By reason of the court's conclusions with respect to the three-part test, the court finds

that as a matter of law plaintiff was an exempt employee within the meaning of the FLSA.

## 2.        Time Records

In addition to the provisions governing overtime compensation, the FLSA provides that an employer must make and keep records of the wages, hours, and other conditions and practices of employment. 29 U.S.C. § 211(c). Plaintiff claims defendant violated the record-keeping provisions of the FLSA. Defendant moved for summary judgment on this claim. Defendant argues that plaintiff is an exempt employee under the administrative exemption, as analyzed above. Since plaintiff is exempt, defendant argues it was not required to maintain time records of the precise number of hours plaintiff worked.

Section 516.3 of the regulations provides "[w]ith respect to each employee in a bona fide . . . administrative . . . capacity . . . , employers shall maintain and preserve records containing all the information and data required by § 516.2(a) *except paragraphs (a)(6) through (10)* . . . ." 29 C.F.R. § 516.3 (emphasis added). The requirement that the employer keep accurate records of the exact number of hours worked each work day and during each work week is encompassed in 29 C.F.R. § 5.16.2(a)(6)-(10). The remaining subsections simply require that the records contain the total wages paid each pay period, the date of payment and pay period covered by each payment, and basic information such as the employee's name, address, age, etc. In this situation, plaintiff alleges that defendant's records violate the FLSA because it failed to maintain accurate records of daily and weekly hours. Since plaintiff is an exempt employee under the administrative exemption, defendant was not obligated to maintain records of the information that plaintiff claims should have been maintained. Plaintiff does not allege defendant violated any other record-keeping provisions of the FLSA. Under these circumstances, the court concludes that no genuine issue of material fact exists as to whether defendant violated the FLSA

for failing to maintain accurate records and summary judgment must be entered in favor of defendant on the FLSA claims.

## B.    Count II – FMLA Claim

Plaintiff claims that defendant violated the FMLA because she was terminated as a result of complaining that UPMC had violated the FMLA on a prior occasion.  In its summary judgment motion, defendant argues that plaintiff cannot establish a prima facie case of a violation of the FMLA, and, even if plaintiff could establish a prima facie case, she cannot prove defendant's legitimate, non-discriminatory reason for terminating her was pretext for unlawful discrimination.

### 1.    FMLA in General

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(b)(1).  The FMLA was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers."  29 U.S.C. §§ 2601(b)(1-2); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. § 2601(b)(1)) (holding that one of "[t]he primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families' . . . ").  The FMLA grants eligible employees the right to take up to twelve work weeks of leave during a twelve-month period for any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.

> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
>
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1).  At the end of the leave period, the employee has the right to be restored to her former position or an equivalent position.  29 U.S.C. § 2614(a)(1).  An equivalent position must have "equivalent employment benefits, pay and other terms and conditions of employment."  Id.

## 2. FMLA Retaliation Claim

In this case plaintiff is asserting only one claim under the FMLA – a claim for retaliation. The anti-retaliation provision of the FMLA provides, in part:

> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA].

29 U.S.C. § 2615(a)(2).  In many cases, it is difficult for a plaintiff to prove an employer acted with conscious intent to discriminate.  The Supreme Court adopted a burden-shifting framework to address this difficulty.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The burden-shifting framework for Title VII retaliation claims is applicable to FMLA retaliation claims.  Duckworth v. Pratt Whitney, Inc., 152 F.3d 1, 9 n. 8 (1st Cir. 1998); Wilson v. Lemington Home for the Aged, 159 F. Supp. 2d 186, 194-95 (W.D. Pa. 2001).  For plaintiff to establish a prima facie case for retaliation under the FMLA, she must show that (1) she opposed a practice made unlawful under the FMLA, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her opposition of the practice.  Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 798 (11th Cir. 2007); Curcio v.

<u>Collingswood Bd. Of Educ.</u>, No. CIVA 04-5100, 2006 WL 1806455, at *11 (D.N.J. June 28, 2006).

### 3. Prima Facie Case

### a. Oppose a practice made unlawful under the FMLA

Plaintiff asserts that on October 10, 2006, plaintiff sent a grievance letter to Reale, Szewczyk, and Devine. The grievance letter addressed many concerns plaintiff had with respect to her job, and included a historical account of several examples of past treatment that she believed were inappropriate or unlawful. One such example involved her exercise of medical leave in 2002.

The first element of plaintiff's prima facie case is that she must have engaged in a protected activity by opposing an unlawful practice under the FMLA. Defendant argues in the pending motion that plaintiff's opposition was not a protected activity under the FMLA for three chief reasons. First, defendant emphasizes that it did not have a policy or course of conduct contrary to the FMLA; plaintiff, therefore, did not oppose a "practice," but merely an isolated, discrete act. Second, defendant argues that plaintiff's conduct does not constitute "opposition" as contemplated by the statute. The purpose of plaintiff's grievance was not to correct the FMLA violation, but rather demonstrate her contentious relationship with Ludewig. Third, defendant argues that plaintiff did not oppose an act that was unlawful. Defendant contends that the act that plaintiff alleged violated the FMLA happened in 2002 and was not actionable at the time the grievance was filed because it would have been time barred. Defendant argues that since the act was beyond the scope of the FMLA's protection, it was not unlawful.

Under other employment discrimination statutes, such as Title VII, a discrete act qualifies

as an "unlawful employment practice." In <u>National Railroad Passenger Corp. v. Morgan</u>, 536

U.S. 101 (2002), the Supreme Court stated "[w]e have repeatedly interpreted the term "practice"

to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts." <u>Id.</u>

at 111. Here, plaintiff only complained of a discrete act, but that act qualifies as an employment

practice.

      Plaintiff's statement in her grievance also constitutes opposition. In the employment

discrimination context, "opposition" requires, at the very least, an informal protest of unlawful

employment practices. <u>Barber v. CSX Dist. Servs.</u>, 68 F.3d 694, 701-02 (3d Cir. 1995) (citing

<u>Summer v. United States Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990)). The protest, in

whatever medium, cannot be a general complaint of unfair treatment; the protest must

specifically oppose a practice that is made unlawful by employment discrimination laws. <u>Id.</u> In

this case, plaintiff specifically opposed a practice made unlawful by the FMLA in her grievance

letter, because she specified the conduct that she opposed and she listed the particular FMLA

provisions that she alleged defendant violated. The court is unaware of any requirement that the

specific purpose of the employee's opposition must be for redressing an FMLA violation.

Defendant did not cite any caselaw to that effect. 29 U.S.C. § 2615(a)(2) merely requires that the

employee be "opposing any practice made unlawful" by the FMLA. The statement of opposition

being included in a letter addressing numerous other subjects may be relevant to the causal

connection between the opposition and an adverse employment action and to the analysis of

defendant's non-discriminatory reasons for taking the adverse action, but is not relevant for

determining whether the statement is opposition conduct.

The underlying FMLA violation being time-barred under the applicable statute of limitations does not render the conduct plaintiff opposes lawful. "Actionable" and "lawful" are not interchangeable terms. Conduct that is actionable is conduct "[f]urnishing the legal ground for a lawsuit or other legal action." BLACK'S LAW DICTIONARY 34 (8th ed. 2004). Conduct that is lawful, on the other hand, is conduct "[n]ot contrary to law" or "permitted by law." BLACK'S LAW DICTIONARY 902 (8th ed. 2004). Here, the conduct complained of was allegedly contrary to the law as set forth in the FMLA. Plaintiff explained defendant's practice in the grievance, and also explained in detail which provisions of the FMLA the practice violates. "[P]rotesting against discrimination by industry or society in general, [or] expressing support of co-workers who have filed formal charges" are protected employee activities under the anti-retaliation provisions of the employment discrimination laws. Barber, 68 F.3d at 702 (citing Sumner, 899 F.2d at 209). Even if the protesting employee in those situations would not have an actionable claim for the underlying conduct being opposed, the employee would have a claim if retaliated against for acting in opposition. In summary, there is sufficient evidence of record for a reasonable finder of fact to conclude plaintiff engaged in opposition of an unlawful employment practice under FMLA. The first element of plaintiff's prima facie case is satisfied.

**b.      Adverse employment action**

With respect to the second element of plaintiff's prima facie case of retaliation, it is undisputed that plaintiff was terminated from her employment with defendant. It is well settled that termination from employment is an adverse employment action. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001); see Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006). Under these circumstances,

plaintiff adduced sufficient evidence to satisfy the second element of a prima facie case of retaliation for opposing a practice made unlawful by the FMLA.

c.      **Causal connection**

With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism.  Abramson, 260 F.3d at 265 ("Temporal proximity . . . is sufficient to establish the causal link.  [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action.  Id.  While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great.  See Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); George v. Genuine Parts Co., No. 04-108, 2007 U.S. Dist. LEXIS 5373, at *34-35 (W.D. Pa. Jan. 25, 2007) (holding that though suggestiveness is highly sensitive to the facts of each case, that a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case.  See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); Jalil, 873 F.2d at 708 (causal link

established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); but cf. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); Quiroga v. Hasbro, Inc., 934 F.3d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation). Timing, however, in connection with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986); see EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 522 U.S. 1147 (1998).

Here, plaintiff alleges that defendant retaliated against her by terminating her on October 19, 2006, less than ten days after she submitted her grievance letter. Plaintiff argues that that temporal proximity is so compelling, that it alone satisfies the third element of her prima facie case. See Lin v. Rohm and Haas Co., 293 F. Supp. 2d 505, 512-13 (E.D. Pa. 2003) (denying a motion for summary judgment, and stating "where the adverse employment action came only ten

days after the protected activity, temporal proximity is strong evidence of a causal connection."). In Farrell, the Court of Appeals for the Third Circuit recognized its apparent ambivalence on whether timing alone is sufficient. The court of appeals explained that the caselaw appears as such because its analysis of whether a causal connection can be established is fact based. Farrell, 206 F.3d at 279. The probative value of temporal proximity "must be considered with a careful eye to the specific facts and circumstances encountered." Id. at 279 n. 5.

In this case, plaintiff's grievance letter raised a number of issues. The FMLA violation being one of many allegations against Ludewig weighs against a causal connection. It is possible that defendant's intent was to terminate plaintiff in response to writing the letter, not because it opposed a practice made unlawful by the FMLA, but because it demonstrated an irreparable disconnect between the employee and management. Defendant does not allege, however, that this was its intent. Defendant instead alleges that its decision to terminate plaintiff had no connection to the letter; defendant alleges it was not financially able to maintain plaintiff's position.

The undisputed facts are that Beaver Valley H. Serv. was operating at a loss for several years prior to the time plaintiff was terminated, and defendant had been considering whether to terminate plaintiff's position in order to save money. See Helfrich v. Lehigh Valley Hosp., No. Civ.A. 03-CV-05793, 2005 WL 670299, at * 20 (E.D. Pa. Mar. 18, 2005) (an employer expressing concern about a problem prior to the time the employee engages in a protected activity weighs against recognizing a causal connection). Although defendant started the evaluation process well before plaintiff submitted her grievance, there is no evidence that defendant decided to eliminate plaintiff's position before the grievance was submitted. Given

that defendant's analysis of plaintiff's position occurred over such a long period of time and there is no evidence of record that defendant acted with any urgency in its analysis, the court believes the temporal proximity of the defendant's adverse action to plaintiff's opposition conduct is sufficient to withstand defendant's motion for summary judgment. The jury could therefore reasonably conclude that there was a causal connection between plaintiff's submission of her letter and termination. Under these circumstances, the court concludes plaintiff adduced sufficient evidence to establish a prima facie case for her FMLA retaliation claim.

### 4. Defendant's Legitimate Business Reason

Once a plaintiff has established a prima facie case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the adverse employment actions against the plaintiff were taken for reasons that are legitimate and nondiscriminatory. Burdine, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, if believed, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes, 32 F.3d at 736; see generally St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for a defendant to persuade the court that it was actually motivated by the reason which its offers. Burdine, 450 U.S. at 254; Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

To satisfy its burden, defendant has claimed it eliminated plaintiff's position because it needed to save operating costs, and that it reassigned the duties associated with plaintiff's position to already-existing employees. Although defendant cannot recall the exact date it began the process of evaluating plaintiff's position for termination, discussions began at the latest in the summer of 2006. Plaintiff's grievance letter was not filed until October 9, 2006.

Recognizing that the burden on a defendant is light, and a defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision," <u>Fuentes</u>, 32 F.3d at 763, the court is satisfied that defendant set forth a legitimate, nondiscriminatory reason for the adverse employment actions taken against plaintiff.

**5.     Pretext**

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." <u>Fuentes</u>, 32 F.3d at 763.  Once the employer has stated a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff, in order to survive summary judgment, must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in <u>Fuentes</u>:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which the fact-finder could reasonably either (1) disbelieve the employers articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

<u>Id.</u> at 764.

**a.     Prong One**

A plaintiff must submit evidence that could cause a reasonable fact finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial.  To discredit the employer's articulated reason, the plaintiff

32

does not need to produce evidence that necessarily leads to the conclusion that the employer

acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.

1995), nor produce additional evidence beyond her prima facie case. Fuentes, 32 F.3d at 764. A

plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic],
> or contradictions in the employer's proffered legitimate reasons
> [such] that a reasonable factfinder could rationally find them
> "unworthy of credence" and hence infer that the proffered
> nondiscriminatory reason "did not actually motivate" the
> employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting Ezold v.
> Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir.
> 1992))**.**

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the

best, or even a sound, business decision; it is whether the real reason for the adverse result

suffered by the plaintiff is discrimination. Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109

(3d Cir. 1997). The court is neither permitted to get involved in the subjective business decisions

of the employer, nor set its own standards for the employer, unless there is evidence of

discrimination. Ezold, 983 F.2d at 527. "An employment decision that would create a problem

under prong one will likely turn on whether the stated reason for [adverse employment action] is

so implausible that a fact-finder could not believe it to [be] worthy of credence." Orenge v.

Veneman, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); see Menta v. Cmty.

Coll. of Beaver County, 428 F. Supp. 2d. 365, 374 (W.D. Pa. 2006). An example of a stated

reason that a fact finder could find implausible and beyond belief was set forth in Brewer v.

Quaker State Oil Ref. Corp., 72 F.3d 326 (3d Cir. 1995). The employer stated that reason for

terminating the employee was because his sales performance was deficient, but the evidence on

the record demonstrated that the terminated employee was the leading salesperson in the region. Id. at 330-32.

In the instant case, plaintiff did not offer evidence that addresses defendant's legitimate business reason. Plaintiff argues that defendant knowing about the grievance letter before it terminated plaintiff is evidence in support of the first prong. Plaintiff argues that defendant's failure to handle plaintiff's grievance in accordance with its established policy is also evidence in support of the first prong. Neither of these examples, however, address defendant's stated business reason for termination. The business reason for the decision was to save costs; none of the evidence raised by plaintiff relates to the cost-saving advantages of the elimination of the position, nor did plaintiff offer evidence that defendant altered its decision-making process to plaintiff's detriment because she filed the grievance letter. On the evidence of record in this case, no reasonable finder of fact could conclude that plaintiff provided sufficient evidence of discriminatory pretext by defendant under the first prong of Fuentes.

**b.    Prong Two**

The court must examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a fact finder to conclude by a preponderance of the evidence that engaging in the protected activity was a motivating or determinative factor in the employment decision. Simpson, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people who

34

engaged in the same protected activity as plaintiff or has discriminated against other people within another protected class, or (3) whether the employer has treated more favorably similarly situated persons who did not engage in plaintiff's protected activity. Id. at 645. In this case, plaintiff failed to adduce sufficient evidence to suggest that defendant previously retaliated against plaintiff or any other similarly situated employee who opposed defendant's FMLA policy and practice. Plaintiff also failed to offer evidence that defendant treated those who have not opposed defendant's FMLA policy and practice more favorably than those who have. No reasonable finder of fact could conclude that plaintiff provided sufficient evidence of discriminatory pretext by defendant under the second prong of Fuentes, and summary judgment is therefore appropriate with respect to plaintiff's retaliation claim.

### C.      Count III – WPA Claim

In plaintiff's response to defendant's summary judgment motion, plaintiff stipulates to the dismissal of her WPA claim. Summary judgment on this claim is appropriate.

### VII.    Conclusion

Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not render a verdict in favor of plaintiff with respect to her claims under the FLSA, PMWA, FMLA, or WPA. With respect to the overtime claims, there is no genuine issue of material fact about whether plaintiff qualifies under the administrative exemption. Also, there is no genuine issue of material fact with respect to plaintiff's claim that defendant failed to maintain records in compliance with the FLSA. With respect to plaintiff's retaliation claim,

plaintiff presented insufficient evidence to establish pretext to overcome defendant's legitimate, non-discriminatory reasons for its adverse employment action. Plaintiff stipulates to the dismissal of her WPA claim. Therefore, summary judgment must be granted in favor of defendant with respect to all plaintiff's claims.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 10, 2009